Argued and submitted May 13, reversed and remanded November 5, 2008

## Jon NORGAARD,
*Plaintiff-Appellant,*

*v.*

## PORT OF PORTLAND,
*Defendant-Respondent.*

Multnomah County Circuit Court
060505475; A134586

196 P3d 67

Meagan A. Flynn argued the cause for appellant. With her on the briefs was Preston Bunnell & Flynn, LLP.

Jay Beattie argued the cause for respondent. With him on the brief was Lindsay, Hart, Neil & Weigler, LLP.

Before Edmonds, Presiding Judge, and Wollheim, Judge, and Sercombe, Judge.

EDMONDS, P. J.

**EDMONDS, P. J.**

This case is about whether the Port of Portland is entitled to immunity from an action based on federal law under the doctrine of "pre-ratification immunity." Plaintiff, who was employed by the Port of Portland, was injured while working on a vessel that was providing assistance to a dredge on the Columbia River. He applied for and received workers' compensation benefits. Plaintiff later brought this action to recover damages under general maritime law and the federal Jones Act. The Port moved for summary judgment, the trial court granted the Port's motion, and plaintiff appeals. Applying the test for immunity set out by the Supreme Court in *Johnson v. SAIF*, 343 Or 139, 164 P3d 278 (2007), we reverse and remand.

In his complaint, plaintiff asserted claims for relief under the federal Jones Act, 46 USC § 30104, and under general maritime law.[1] He alleged that the Port was negligent and that, as a result of the Port's negligence, he sustained serious injuries. In its answer, the Port asserted, among other positions, that it was immune from liability under the doctrine of sovereign immunity. As noted, the Port moved for summary judgment, which the trial court granted. The court dismissed plaintiff's complaint and entered judgment in favor of the Port. Plaintiff appeals.

On appeal, the parties reprise their arguments regarding sovereign immunity. Plaintiff argues that Congress has abrogated state sovereign immunity for actions brought under the Jones Act and general maritime law, and that those provisions preempt contrary state law. In addition, plaintiff argues, even if the state itself is immune on the basis of preratification immunity, the Port is not entitled to share in that cloak of immunity because it is not an "arm of

---

[1] The Jones Act, 46 USC § 30104, provides:

"A seaman injured in the course of employment or, if the seaman dies from the injury, the personal representative of the seaman may elect to bring a civil action at law, with the right of trial by jury, against the employer. Laws of the United States regulating recovery for personal injury to, or death of, a railway employee apply to an action under this section."

The current version of the statute includes changes from the version in effect at the time of plaintiff's injury, but those changes are immaterial to our analysis.

the state." The material facts are undisputed; accordingly, we review the trial court's grant of summary judgment for errors of law. *Povey v. City of Mosier*, 220 Or App 552, 554, 188 P3d 321 (2008). Because we agree that the Port is not an arm of the state for purposes of immunity from actions brought under federal law, we need not address plaintiff's other arguments.

■ ■ Although courts often refer to the Eleventh Amendment to the United States Constitution as the source of the states' immunity from actions brought under federal law, that is not in fact the source of state sovereign immunity known as "pre-ratification immunity." "Rather," the United States Supreme Court has explained,

> "as the Constitution's structure, its history, and the authoritative interpretations by this Court make clear, the States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today (either literally or by virtue of their admission into the Union upon an equal footing with the other States) except as altered by the plan of the Convention or certain constitutional Amendments."

*Alden v. Maine*, 527 US 706, 713, 119 S Ct 2240, 144 L Ed 2d 636 (1999).[2] Thus, there is no question that the states enjoyed immunity from private actions before the ratification of the federal constitution and that they continue to enjoy such immunity, but the Court has also made clear that preratification immunity does not extend to certain political subdivisions of the states. "The bar of the Eleventh Amendment to suit in federal courts extends to States and state officials in appropriate circumstances, but does not extend to counties and similar municipal corporations." *Mt. Healthy City Board of Ed. v. Doyle*, 429 US 274, 280, 97 S Ct 568, 50 L Ed 2d 471 (1977) (citations omitted). Whether a particular state entity is entitled to share in the state's preratification immunity from federal action is a question of federal law and depends on whether the entity is an "arm of the state." *Regents of*

---

[2] Accordingly, references below to "Eleventh Amendment immunity" should be read to refer to "pre-ratification immunity."

*Univ. of Cal. v. Doe*, 519 US 425, 429 n 5, 117 S Ct 900, 137 L Ed 2d 55 (1997).

■ Initially, the parties disagree about whether *Johnson* provides the controlling analysis for this court to apply to the circumstances of this case. In plaintiff's view, the *Johnson* court "synthesized the controlling federal case law and set out the controlling frames by which the question of arm-of-the-State immunity must be resolved in Oregon courts." The Port disagrees. In its view,

> "*Johnson* addresses the question of whether a governmental entity (SAIF) is a 'person' within the meaning of Section 1983, 42 USCA Section 1983. Although the Supreme Court has applied its Eleventh Amendment case law in determining whether a governmental entity is an 'arm of the state' and therefore not a 'person' within the meaning of Section 1983, the fundamental question in those cases is one of statutory construction; who is a 'person' within the meaning of Section 1983? The question here is different, *vis.*, which governmental entities are entitled to share in a state's pre-ratification sovereign immunity? Indeed, *Johnson* does not cite either *Alden* or [*Northern Ins. Co. of N.Y. v. Chatham County, Ga.*, 547 US 189, 126 S Ct 1689, 164 L Ed 2d 367 (2006)]—the only two Supreme Court cases discussing pre-ratification sovereign immunity as a limitation on federal authority to subject non-consenting states to suits for money damages in their own courts."

We reject the Port's argument. In *Johnson*, SAIF argued that it was an arm of the state under the holding in *Will v. Michigan Dept. of State Police*, 491 US 58, 70, 109 S Ct 2304, 105 L Ed 2d 45 (1989), a case in which the United States Supreme Court held that Congress did not intend section 1983 to apply to the "States or governmental entities that are considered 'arms of the State'[.]" Under *Will*, an entity is a "person" for purposes of section 1983 only if the entity is not an "arm of the state" for preratification immunity purposes. In order to determine whether SAIF was a "person" for purposes of section 1983, the *Johnson* court was therefore required to resolve whether SAIF was an "arm of the state." That is the same question that must be resolved in this case. After conducting a survey of federal law, the *Johnson* court established the test for Oregon courts to apply

in determining preratification immunity. Noting that the United States Supreme Court "has not articulated and applied a consistent test," the court explained that the cases "make it apparent that immunity is a case-specific inquiry that turns on whether 'the state is the real, substantial party in interest.'" *Johnson*, 343 Or at 146 (quoting *Pennhurst State School & Hosp. v. Halderman*, 465 US 89, 101, 104 S Ct 900, 79 L Ed 2d 67 (1984)).

■ In our opinion in *Johnson*, we identified a number of factors that the United States Supreme Court deems as relevant to the "arm of the state" inquiry. We explained that the Court "has variously applied tests involving anywhere from two to six different factors." *Johnson v. SAIF*, 202 Or App 264, 273, 122 P3d 66 (2005), *adh'd to on recons*, 205 Or App 41, 132 P3d 1058 (2006), *aff'd*, 343 Or 139, 164 P3d 278 (2007). We also noted that lower federal courts have employed a number of tests involving up to nine factors. *Id.* at 275. Ultimately, however, we decided that "two principles are consistently at the forefront of Eleventh Amendment 'arm-of-the-state' analysis":

> "First, the courts—in particular, the Supreme Court—nearly always emphasize the importance of the characterization of the entity as a matter of state law. * * *

> "Second, courts—again, especially the Supreme Court—nearly always emphasize the importance of identifying whether the state treasury may be liable for the obligations of the entity at issue. Some lower courts even characterize that factor as the most significant."

*Id.* at 275-76.

On review, the Supreme Court adopted our characterization of the test:

> "We agree with the Court of Appeals that the many factors that the Supreme Court has identified as relevant at one time or another can be subsumed within the two primary tests described above—the characterization and nature of the entity under state law and the liability of the state for the financial obligations of the entity—and that breaking the analysis back down into further discrete steps does not serve a useful purpose. *Id.* at 276. Moreover, we apply those tests, as *Hess* [*v. Port Authority Trans-Hudson Corporation*,

513 US 30, 44, 115 S Ct 394, 130 L Ed 2d 245 (1994),]
requires, in light of the two concerns—'the States' solvency
and dignity'—that 'underpin the Eleventh Amendment.'
*Hess*, 513 US at 52."

*Johnson*, 343 Or at 148. Accordingly, we reject the Port's
argument that *Johnson* does not provide the correct legal
tests for determining whether the Port is an arm of the state
for preratification immunity purposes.

■      Our remaining task in this case is to apply the
*Johnson* test to determine whether the Port is an "arm of the
state." The test first requires that we assess how the Port is
characterized under state law. We have little trouble con-
cluding that the Port is characterized under state law as part
of the state government, in part because the Oregon Supreme
Court has said so. In *Hale v. Port of Portland*, 308 Or 508, 783
P2d 506 (1989), the Supreme Court addressed whether the
Port is part of the state for purposes of immunity from actions
brought under state law—in contrast to actions brought
under federal law. After considering the legislation under
which the Port was created, the court concluded that, for pur-
poses of immunity from state actions, it is. The court's
analysis, in its entirety, was as follows:

> "The Port of Portland was established by 1891 Or Laws
> 791 as 'a separate district, to be known as The Port of
> Portland' (Section 1), which was, among other things, to
> 'have full control of [the Willamette and Columbia Rivers]
> at [Portland, East Portland and Albina], and between said
> cities and the sea, so far and to the full extent that this
> State can grant the same' (Section 3). While its functions
> have been expanded to reflect the changed commercial
> focus of the Pacific Northwest due to the passage of nearly a
> century, the Port continues to promote, *inter alia*, the mar-
> itime and shipping interests of the greater Portland area.
> ORS 778.015; *see generally* ORS ch 778 (establishing the
> Port of Portland and describing its organization, functions,
> and duties); *see also Cook v. The Port of Portland*, 20 Or 580,
> 27 P 263 (1891) (declaring the Port's organic act constitu-
> tional). Unlike cities, but like other port districts, *see gen-
> erally*, ORS ch 477, the Port is an instrumentality of the
> state government, performing state functions.

"* * * The Port, being a part of the state's government, therefore is immune from suit to the same extent the state as such is immune."

*Hale,* 308 Or at 517-18; *see also Clarke v. OHSU,* 343 Or 581, 595, 175 P3d 418 (2007) ("In *Hale,* this court concluded that the Port of Portland was an instrumentality of the state entitled to immunity from civil liability."); *Ortega v. Port of Portland,* 147 Or App 489, 493, 936 P2d 1037 (1997) (noting that the case did not involve "an assertion of sovereign immunity by a 'non-state' sovereign" and citing *Hale*).

Moreover, although the Port is in some ways more like a county or municipality—for example, it is statutorily described as a "municipal corporation," ORS 174.116(2)(hh); ORS 198.605—the purpose of the Port is a broad one "to promote the maritime, shipping, aviation, commercial and industrial interests of the port as by law specifically authorized." ORS 778.015. The Port can purchase or acquire property by condemnation, ORS 778.025; ORS 778.095; it can borrow money and sell and dispose of general obligation and revenue bonds, ORS 778.030; ORS 778.145; it can assess, levy, and collect taxes, ORS 778.065; the Port "has full control of the rivers, harbors and waterways within its boundaries and between its boundaries and the sea" to the same extent that the state does, ORS 778.085(1); the Port's board of commissioners is appointed by the Governor, ORS 778.210; the Port may enact ordinances, ORS 778.255, and it has the powers of initiative and referendum, ORS 778.270. In light of the Supreme Court's consistent treatment of the Port as an instrumentality of the state, together with the statutory support for that treatment, we conclude that the first part of the *Johnson* test is satisfied.[3]

---

[3] We note that the Supreme Court recently has set out a more definite test for determining whether an entity is an "instrumentality" of the state and thus is entitled to immunity from suit under state law. In *Clarke,* the court stated,

"An instrumentality of the state performs a function traditionally performed by the state. Additionally, the state generally outlines the powers and duties of its instrumentalities, either via statutory enactment or some other method. An instrumentality of the state is subject, at least in part, to the control of the state in some way."

343 Or at 596. We have no reason to believe that the court's characterization of the Port under that test would differ from its characterization of the Port in *Hale.*

The application of the second part of the *Johnson* test, however, yields a different result. That part requires us to discern whether the state treasury is liable for the Port's debts. The parties dispute the importance of the state's liability for the entity's financial obligations. But we think that the United States Supreme Court has made it clear that the question of whether the state is liable for the Port's financial obligation is essential to the analysis. In *Hess*, the Court stated,

> "If the expenditures of the enterprise exceed receipts, is the State in fact obligated to bear and pay the resulting indebtedness of the enterprise? When the answer is 'No'—both legally and practically—then the Eleventh Amendment's core concern is not implicated."

513 US at 51; *see id.* at 48 (describing "the prevention of federal-court judgments that must be paid out of a State's treasury" as the "impetus for the Eleventh Amendment"). Whether a money judgment against a state instrumentality would be enforceable against the state "is of considerable importance" to the federal immunity question. *Regents of the Univ. of Cal.*, 519 US at 430. Indeed, in *Hess*, the Court noted—quoting an *amicus* brief—that the "vast majority" of federal circuit courts "have concluded that the state treasury factor is the most important factor to be considered * * * and, in practice, have generally accorded this factor dispositive weight." 513 US at 49.

The Port cites no statutory authority to support a conclusion that the state treasury is liable for the Port's debts, and our own research does not reveal the existence of any such statutes. Instead, the Port asserts that, because of the Port's importance to the state's economy and its operation of the state's sole international airport, the state would—as a practical matter—be required to come to its aid financially in the event of insolvency, which, in the Port's view, renders it an "arm of the state." In support of its position, the Port relies on two cases from the Ninth Circuit, *Alaska Cargo Transp. Inc. v. Alaska R.R. Corp.*, 5 F3d 378 (9th Cir 1993), and *Aguon v. Commonwealth Ports Authority*, 316 F3d 899 (9th Cir 2003).

In *Alaska Cargo Transp. Inc.*, the court considered whether the Alaska Railroad Corporation was an arm of the

State of Alaska for purposes of immunity from federal suit. The railroad conceded—and state law unambiguously provided—that it, and not the state, was liable for a judgment against it. *Id.* at 380. Nonetheless, reasoning that the railroad was "a unique and essential fixture in the lives of thousands of widely dispersed Alaskans" and that the "uniqueness of Alaska's geography and harsh weather conditions make the operation of the railroad a necessity," *id.* at 380-81, the court concluded that the railroad was an arm of the state. The Ninth Circuit agreed with the district court that,

> "if faced with a large money judgment, [the railroad] would be compelled to turn to legislative appropriation in order to remain in business, and the legislature would have to respond favorably so that the 'essential' transportation function would continue to be performed and to protect the state's very substantial investment in the Alaska Railroad."

*Id.* at 381. Ultimately, the court held, it was "persuaded that a money judgment against [the railroad] likely would impact Alaska's treasury because of the state's strong interest in keeping [the railroad] operationally and fiscally sound." *Id.* at 382.

In *Aguon*, the Ninth Circuit relied on its reasoning in *Alaska Cargo Transp. Inc.* to conclude that the port authority in question there was an arm of the Commonwealth of Northern Mariana Islands. As in *Alaska Cargo Transp. Inc.*, the Commonwealth had no legal duty to provide funds to the port authority. Nevertheless, the court believed that, if the port authority "were to be faced with a large money judgment which it could not pay, the Commonwealth would be compelled to protect its island economy by responding with an appropriation * * *." *Id.* at 903.

We reject the Ninth Circuit's approach, because its reasoning is inconsistent with the reasoning in *Johnson*. As noted, the proper inquiry under *Johnson* is "whether the state treasury is liable for the debts of" the entity, not whether the state likely would come to the entity's rescue in the event of insolvency. Moreover, in *Regents of the Univ. of Cal.*, the Court stated that, "with respect to the underlying

Eleventh Amendment question, it is the entity's *potential legal liability*, rather than its ability or inability to require a third party to reimburse it, or to discharge the liability in the first instance, that is relevant." 519 US at 431 (emphasis added). Absent any statutory assumption of the Port's liabilities by the state, we conclude that the state has no potential legal liability for the Port's liabilities.[4]

■ To summarize, although the Oregon Supreme Court has characterized the Port as a state instrumentality for purposes of state law immunity, the record before us demonstrates that it is financially independent from the state and that the state is not a "real, substantial party in interest" when the Port is sued. It follows that the Port is not an arm of the state for purposes of preratification immunity and is therefore not entitled to immunity from plaintiff's federal law action under that doctrine.[5]

Reversed and remanded.

---

[4] The Ninth Circuit appears to have retreated from the "likely to impact the state treasury" analysis it employed in *Alaska Cargo Transp. Inc.* and *Aguon.* In *Beentjes v. Placer County Air Pollution*, 397 F3d 775 (9th Cir 2005), the pollution control district argued that it was an arm of the state because the state ultimately would be responsible in the event that a money judgment threatened the district's survival. The Ninth Circuit rejected the district's reliance on *Alaska Cargo Transp. Inc.* and *Aguon*, pointing out that, in *Alaska Cargo Transp. Inc.*, it had "relied on a state statute that *required* the railroad to seek funding from the state legislature if a particular service was not self-sustaining." *Beentjes*, 397 F3d at 781 (emphasis in original). The *Beentjes* court concluded that,

"in the absence of a showing that money used to pay a judgment will necessarily be replaced with state funds, we adhere to our basic proposition that the fact that the state may ultimately *volunteer* to pay the judgment * * * is immaterial; the question is whether the state treasury is legally obligated to do so."

*Id.* (internal quotation marks and citations omitted; emphasis in original).

[5] In *Ortega*, we addressed whether the Port was entitled to immunity from a federal action when the action was based on general maritime law. Focusing on a preemption analysis, we determined that general maritime law did not preempt the state's immunity from federal suit. Then, without analysis, we extended that immunity to the Port. However, the plaintiff in *Ortega* did not argue that the Port was not an arm of the state for federal immunity purposes, nor did we purport to address that issue. Rather, we simply quoted *Hale* for the proposition that the "Port, being a part of the state's government, therefore is immune from suit to the same extent the state as such is immune." *Ortega*, 147 Or App at 493 (quoting *Hale*, 308 Or at 518). Our holding in *Ortega* should now be considered in light of the Supreme Court's holding in *Johnson* and our holding in this case.